IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

TONY DAUGHERTY,

      Petitioner,

v.                                 Case No. 5:12-cv-00043

DENNIS DINGUS,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Frank W. Volk, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 and **DISMISS** this civil action from the docket of the court.

## RELEVANT PROCEDURAL HISTORY

On September 30, 2004, Petitioner was convicted by a jury in the Circuit Court of Summers County, West Virginia, of sexually abusing his son, TJ. The jury was presented with 12 charges, but returned guilty verdicts on only four counts of sexual abuse by a parent in violation of W. Va. Code § 1-8D-5. Those convictions were affirmed by the Supreme Court of Appeals of West Virginia (the "SCAWV") on direct appeal and post-conviction habeas corpus review. The relevant rulings of the state courts will be discussed

as necessary *infra*.  Throughout his criminal and state post-conviction proceedings, Petitioner was represented by the same attorney, Barry L. Bruce ("Bruce"), and the law firm of Barry L. Bruce and Associates.

On December 6, 2011, Petitioner, proceeding *pro se*, filed his initial Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of West Virginia.  It was subsequently transferred to this United States District Court, which the proper venue.

Following appointment of counsel and protracted evidentiary proceedings, the Honorable Irene C. Berger adopted the magistrate judge's proposed findings and recommendation and ruled that, although Petitioner's § 2254 petition was untimely filed under 28 U.S.C. § 2244(d), the statute of limitations should be equitably tolled due to Petitioner's belief that Bruce was going to file his federal habeas corpus petition and Bruce's related conduct.  (ECF Nos. 111, 114).  The undersigned will not revisit or restate that portion of the procedural history herein.

Additional discovery proceedings were held concerning the availability of portions of Petitioner's trial transcript that had not been made a part of the state court record and, ultimately, eight volumes of trial transcripts were filed, under seal, in the record before this court (ECF Nos. 146-153).  Following a change in court-appointed counsel, Petitioner was afforded the opportunity to file an Amended Petition (ECF No. 187) and Memorandum of Law in support thereof (ECF No. 188), on which this matter is now proceeding.  The amended petition asserts three claims for relief:  (1) that Petitioner was denied his right to due process of law by not being provided with a complete transcript of his trial prior to seeking appellate review; (2) that Petitioner received ineffective assistance of counsel on appeal when Bruce proceeded with the appeal of Petitioner's

conviction without a complete transcript and further gave up the right to oral argument; (3) that Petitioner was denied the right to due process of law by juror misconduct during jury deliberations. (ECF No. 187 at 1-2).

Respondent filed an Answer to the Petition (ECF No. 194) and Petitioner filed a Reply (ECF No. 195). Respondent was subsequently granted leave to file a sur-reply (ECF No. 196). This matter is ripe for adjudication.

## SUMMARY OF RELEVANT EVIDENCE

TJ was born in 1991 to Petitioner and his wife, Rebecca Daugherty ("Rebecca"). In July of 1998, Rebecca and TJ left the marital home in Forest Hills, Summers County, West Virginia, and moved to a women's shelter in Raleigh County. While at the shelter, allegations arose that TJ had been sexually abused by Petitioner. Subsequently, TJ was committed, several times, to psychiatric institutions due to behavior problems. During his second and third hospitalizations, he contended that Petitioner had sexually abused him. In 2001, Petitioner was charged with 16 counts of sexual offenses, including sexual assault, incest, and sexual abuse by a parent. *See State v. Daugherty*, 650 S.E.2d 114, 115 (W.Va. 2006) (per curiam). His trial began in September 2004.

### A.    Jury Selection.

During jury selection, the trial court inquired as to whether any prospective juror knew Petitioner. The jury pool was silent. (ECF No. 146 at 10). Bruce later inquired as to whether any prospective juror had failed to "disclose any baggage or any prejudice or any feelings you may have about either side in this case." Again, the jury pool was silent. (*Id.* at 44).

During the voir dire, prospective juror William McBride ("McBride") indicated that he knew one of the potential witnesses, Pete Tabor, who ultimately did not testify. (*Id.* at

18).  However, McBride did not indicate that he knew anyone else involved with the case – including Daugherty, his family or his wife's family – and remained silent when the judge asked if any of the jurors had any knowledge about the case that might prejudice them. (*Id.* at 9, 12, 13-21, 28-32). McBride was ultimately selected as a juror in the case.

### B.     The prosecution's case

The first witness was West Virginia State Trooper Jason Burdette ("Burdette"), who, in 2001, was assigned to investigate TJ's sexual abuse allegations.  Burdette stated that, although TJ was reluctant to talk about the alleged abuse, he stated that his father had "done something really nasty to him." (ECF No. 147 at 62-63).[1]  Burdette confirmed that the alleged abuse occurred in 1997-1998, and that there were at least two, and up to six, incidents of suspected abuse.  He presented information about four instances to the grand jury.  (*Id.* at 37-40).

TJ's mother, and Petitioner's ex-wife, Rebecca, testified that, although hesitant to accept it at first, she ultimately came to believe that Petitioner had sexually abused TJ. She recalled seeing Petitioner fondling TJ as an infant, and also remembered Petitioner making the statement "Who's f***ing you up the butt?" in response to TJ's repeated bowel problems.  (*Id.* at 75-81, 126-27).  Prior to the disclosures he made at the shelter, TJ had never told Rebecca that Petitioner had sexual abused him, but he repeatedly told her that his "daddy was mean" to him.  (*Id.* at 77-78).

Steve Farris ("Farris"), a psychologist specializing in treating children, was the first of several expert witnesses to testify.  He did not interview TJ, but did review the extensive medical records produced as a result of TJ's multiple hospitalizations and TJ's videotaped

---

[1] When citing to the trial transcripts, the undersigned will use the CM/ECF docket number and associated pagination, rather than the transcript page.

interview. (ECF No. 148 at 23, 30). Farris acknowledged that, during his first admission at Highland Hospital – where he was diagnosed with ADHD and encopresis (defecation in one's underwear) – TJ expressed being fearful of his father, but he did not make any allegations of sexual abuse. (*Id.* at 32-33).

Farris further testified that, during a second admission at Highland Hospital, TJ alleged, for the first time, that Daugherty had anally raped him. (*Id.* at 38). During that hospitalization, TJ was also violent towards other children, threatened to anally rape another patient, and said he heard both the Devil and Petitioner speaking to him. (*Id.* at 38-39). TJ would also smear and eat his own feces. (*Id.*) TJ was eventually transferred to River Park Hospital for more long-term care. (*Id.* at 43-44).

Farris testified that TJ exhibited similar behaviors at River Park and made "repeated" disclosures of sexual abuse by Petitioner. (*Id.* at 48, 51). TJ's conduct caused doctors at River Park to explore sexual abuse as a potential cause for his behaviors. (*Id.* at 47). Staff also noted exaggerations on TJ's part. (*Id.* at 48-49). Farris testified that TJ likely exaggerated to impress other children. (*Id.* at 53). At one point, TJ accused another young man, James, of also abusing him, but he later admitted that he made up that allegation. (*Id.* at 50, 58, 143). However, Farris called TJ's allegations of abuse against Petitioner "very consistent" and stated that those consistent allegations were more important than the false accusation against James. (*Id.* at 54, 58).

On cross examination, Farris testified that there was no physical evidence of sexual abuse in the records he reviewed, and acknowledged that there was evidence in the records of Rebecca pushing the issue of sexual abuse and noting her ongoing divorce proceedings. (*Id.* at 72-73, 83). Farris also explained that the records showed that TJ did

not respond well to confrontation about his lies and would continue to lie to avoid getting caught. (*Id.* at 95-98).

TJ testified that Petitioner sexually abused him on at least four occasions in the bedroom and bathroom of their home, and he contended that his behavior while in the hospital was "proof" of such abuse. (*Id.* at 132-33, 144-45). However, he also admitted that he "did kind of lie a lot" during his final hospital admission. (*Id.* at 159). He also explained that he falsely accused James of abusing him because he was "angry at him." (*Id.* at 143). TJ did not remember much from the time period where the abuse allegedly occurred, or during his treatment. (*Id.* at 150-156, 161).

The prosecution also called Mary Treece, a Child Protective Services worker, who investigated the allegation of sexual abuse made by TJ while he was at the shelter. She testified that she questioned TJ about his behavior at the shelter, but that he did not initially want to answer her. (ECF No. 149 at 8-9, 11-19). Upon further questioning, TJ told her something "nasty" had happened "to another boy," but she explained that such "disassociation" was "common." (*Id.* at 14). She also testified about her notes concerning a phone call in which Rebecca stated that she did not believe TJ had been sexually abused. (*Id.* at 26-27).[2]

The State also presented a series of witnesses from River Park Hospital, where TJ had his third, and longest, commitment. Their testimony was largely cumulative of previous evidence – that, while in the hospital, TJ contended that Petitioner sexually abused him, but that he also had issues with fabrication and exaggeration. The last of

---

[2] At the conclusion of Treece's testimony, the prosecution asked to approach the bench. When the court reporter attempted to come to the bench to transcribe the conference, the trial court stated, "you don't need to make a record of it" and "if we do, we'll tell you." (*Id.* at 28). Thus, the bench conference was not recorded. It appears that multiple other bench conferences were similarly not recorded.

these witnesses for the State was Dr. Steven Casdorph ("Casdorph"), who had been TJ's treating psychiatrist. After summarizing his observations of TJ's behavior, Casdorph offered his opinion that TJ's behavior was "consistent" with being a victim of sexual abuse. (*Id.* at 207). While he could not be certain it was sexual abuse, he was certain that TJ had suffered some kind of "[s]evere trauma." (*Id.* at 207–08). Finally, absent objection from the defense, Casdorph testified that there was no chance – "Zip. Not at all." – that TJ was making up the abuse allegations. (*Id.* at 202).

### C.    Defense's case

Petitioner's primary witness was Dr. Joseph Wyatt ("Wyatt"), a psychologist who had experience with conducting forensic interviews. He testified that, in his opinion, based on a review of the medical records, TJ had not been sexually abused, and that many of his behavioral problems started before there was any reported abuse. However, Wyatt did not personally examine TJ. (ECF No. 150 at 136, 138). He also testified that there were other stressors in TJ's life that could have manifested in behavioral issues and that the most serious issues (which led to his final hospitalization) took place 18 months after TJ had last seen Petitioner. (*Id.* at 138, 151-52). Wyatt also explained that TJ was subjected to multiple suggestive interviews, which could have led to false accusations of abuse. (*Id.* at 141-45, 157-59). He also noted that allegations of sexual abuse frequently arise during custody battles and that research has shown children to be very suggestible. (*Id.* at 172-77).

Petitioner also presented testimony from a pediatrician and a psychologist who treated TJ. The pediatrician, Dr. William Dukart, testified that TJ and Rebecca made no reports of sexual abuse to him. (ECF No. 151 at 13-25, 31). The psychologist, Michael Morello, testified that he evaluated TJ after a referral from the women's shelter, but that,

neither Rebecca, nor TJ, alleged sexual abuse at that time. (ECF No. 151 at 64-65). He also explained that, generally, the timing of a forensic interview is significant because "if the forensic interview wasn't done when he disclosed then to allow him to continue sexual abuse treatment contaminates his believability." (*Id.* at 176, 191).

Petitioner was the final defense witness. Aside from stating his name and age, he was asked only one question: "[d]id you sexually abuse, in any way, your son?" (*Id.* at 147). Petitioner denied sexually abusing TJ. (*Id.* at 147). On cross examination, the prosecutor simply asked Petitioner if he had "any other statements you'd like to make for this jury today," to which he responded, "Just that I'm not guilty." (*Id.* at 148-49).

### D.    Verdict

Following the close of the evidence, the State dismissed the four counts of third-degree sexual assault, leaving twelve counts for the jury's consideration. (ECF No. 152 at 186, 252). The jury deliberated for about three hours before reporting that it was deadlocked. (*Id.* at 260). The parties ultimately agreed that the court should give the jury an *Allen* charge. (*Id.* at 264-65). After explaining that, if "we declare hung jury . . . we have to go back and start over" and "throw six days of work out the window," the court gave the jury an *Allen* charge but, when the jurors were still unable to reach a verdict later that evening, the court dismissed the jury for the night. (*Id.* at 266-73). The following day, the jury returned a verdict convicting Petitioner of four counts of sexual abuse by a parent, while acquitting him on the other eight charges in the indictment. (ECF No. 153 at 3-4). Petitioner was sentenced to four concurrent terms of 10 to 20 years in prison. *Daugherty*, 650 S.E.2d at 115.

### E.    Motion for new trial

After Petitioner's conviction and sentencing, Bruce learned that juror McBride may have made improper remarks about Petitioner during jury deliberations.  Thus, Petitioner filed a motion for a new trial based on that information, and the court conducted an evidentiary hearing on November 30, 2005.   In that hearing, the court permitted questioning of each juror about McBride's alleged improper statements, but prohibited questioning about how those statements influenced the jury's deliberations.  (ECF No. 187, Ex. A at 20-21).

During the hearing, every juror from Petitioner's trial testified.  One juror, Sharon Crookshanks, testified that she spoke with Bruce's investigator about an unrelated matter several months after the trial. (*Id.* at 38-40).  At that time, she told the investigator that McBride had said he knew Petitioner and his family and feared for his own family's safety – and the other jurors should be afraid for theirs – if Daugherty was not convicted. Crookshanks further said:

> CROOKSHANKS: One of the main things I remember is one of our jury members stating he was scared for his family if Tony wasn't put in jail or sentenced or whatever, and that we should be scared.
>
> *           *           *
>
> BRUCE: Did [Juror] McBride say anything else other than that statement you just testified to?
>
> CROOKSHANKS: Just that he knew the family and that we should be afraid about.

(*Id.* at 37-38).  Crookshanks said she thought the statement was made "the night that we were here so late."  (*Id.* at 37).  She further emphasized that it had "a great deal" of impact on her.  (*Id.* at 38).

Three other jurors testified that they also heard McBride make these statements. (*Id.* at 30, 35, 64). Juror Harvey Bryant confirmed that McBride had expressed fear to the other jurors because he "lived in the same vicinity" as Daugherty and "knew [] Daugherty's family," which ultimately "influence[d] [Juror Bryant's] decision." (*Id.* at 30-31, 33) ("He said he know'd the Daugherty family and that if not found guilty that he feared for his two young children.").

Juror Everette Cox testified that McBride "said he knew Daugherty and his family and if we didn't do something with him he feared for his own kids," a statement that "had an impact" on him. (*Id.* at 35). Juror Kevin Schaffer testified that "at least one" of the other jurors stated that they knew Petitioner or his family, but he couldn't recall any specifics. (*Id.* at 64). The remaining jurors testified that they did not recall hearing any such statement, but most conceded such a statement could have been made. (*Id.* at 53-54, 56, 61, 68-69, 70-71, 73-74, 77).

McBride denied making the alleged statements during the deliberations. (*Id.* at 46-52). Petitioner also testified that, to his knowledge, he did not know McBride or his family. (*Id.* at 43-44).

The trial court denied Petitioner's motion for a new trial by written order on December 27, 2005. (ECF No. 32, Ex. 1 at 40-49). First, the court found that McBride would not have been subject to challenge for cause based on his knowledge of Petitioner or his family because both McBride and Petitioner testified that they did not know one another. (*Id.* at 46). Consequently, there was insufficient evidence to overcome the "presumption of impartiality" to which jurors are entitled. (*Id.* at 45-46) (citing *State v. Wade*, 490 S.E.2d 724 (W.Va. 1997)).

Second, the court found that McBride's statements did not prejudice Petitioner because the testimony at the evidentiary hearing did not indicate that the jury's deliberations "were anything other than a full, frank, and free discussion of all the issues submitted to the jury." (*Id*. at 48) (internal quotation marks omitted). The court went on to conclude that, "although the juror may have commented upon his mental process, or fear, of future harm by the accused, evidence of this to overturn a verdict is violative of Rule 606(b) [of the West Virginia Rules of Evidence] and must not be utilized to impeach the conviction." (*Id*.)

### F.     Direct appeal rulings

Petitioner sought review of his conviction by the Supreme Court of Appeals of West Virginia ("SCAWV"). His petition for appeal raised six claims of error, but the court ultimately agreed to review only one issue: whether the trial court improperly denied his motion for a new trial due to juror misconduct. *Daugherty*, 650 S.E.2d at 115, n.3.[3] Petitioner argued that McBride's statements "constituted improper extrinsic evidence" and, thus, "he is entitled to a new trial." *Daugherty*, 650 S.E.2d at 116.

The case was scheduled for oral argument. However, just prior to argument, the Assistant Attorney General representing the State passed away. Following that development, Bruce (with Petitioner's consent) agreed to submit the case for resolution on the briefs alone. (ECF No. 187, Ex. B). Bruce and the State's counsel also discussed what to do about the lack of the remaining four days of trial transcripts and they reached an agreement that the appeal could continue without the missing transcripts because they were not germane to the issue accepted for review by the SCAWV, and that neither would

---

[3] Among the other issues raised was the sufficiency of the evidence supporting the convictions and that Petitioner had been denied his right to a fair trial on several grounds. (ECF No. 32, Ex. 1 at 6-39).

argue anything from the Defendant's case since the appeal issue was very narrow. Because the record contained the complete transcript of the hearing on the motion for a new trial based upon juror misconduct, which was the sole issue the court had accepted for review on appeal, Bruce informed Petitioner that, in his opinion, the "record was well documented and well briefed." Petitioner agreed to submit the case on the record submitted. (ECF No. 80 at 22).

The SCAWV affirmed Petitioner's conviction, noting that, while the trial lasted for six days, "the record submitted on appeal only contains the transcript of the first two days of the trial." *Daugherty*, 650 S.E.2d at 114-15 n.6. The Court observed that the general rule of not inquiring into jury deliberations enshrined in West Virginia Rule of Evidence 606(b) yields when "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* at 117 (quoting Cleckley, *Handbook on Evidence*, § 6-6(B)). Thus, if a jury considers extrinsic evidence, "a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant." *Daugherty*, 650 S.E.2d at 117 (quoting *State ex rel. Trump v. Hott*, 421 S.E.2d 500, 504 (W.Va. 1992)). As noted by Petitioner, in its analysis, the SCAWV separated McBride's statement into two distinct parts: "(1) that he was afraid that something could happen to his children if Mr. Daugherty was not convicted, and (2) that he knew Mr. Daugherty and his family." *Daugherty*, 650 S.E.2d at 118.

With regard to McBride's comment that he feared for the safety of his children, the Court agreed with the trial court that such a statement "related, intrinsically, to the jury's deliberative process and resulted in no grounds to set the verdict aside." *Id.* at 118 (quoting *Brooks v. Harris*, 495 S.E.2d 555, 559 (W.Va. 1997)). Concerning McBride's

statement that he knew Petitioner and his family, the Court explained that the "limited record presented in this appeal does not show that the statement posed a reasonable possibility of prejudice." *Id.* at 119. The Court also concluded that, "[f]rom what this Court is able to ascertain from the limited record presented on appeal, the evidence to sustain the four convictions was sufficient beyond a reasonable doubt." *Id.* Petitioner filed a petition for rehearing, in which he asserted that the court "misapprehended" matters related to McBride's statements and the sufficiency of the evidence. (ECF No. 187, Ex. C). The court denied the rehearing petition. (ECF No. 32, Attach. 1 at 64).

The United States Supreme Court subsequently refused a Petition for a Writ of Certiorari. *Daugherty v. West Virginia*, 552 U.S. 829 (2007). Petitioner's state habeas corpus proceedings followed.

### G.    State habeas corpus rulings

In his state habeas corpus proceedings, the circuit court found that Petitioner's claim that his verdict was not rendered by a fair and impartial jury was fully and finally adjudicated in his direct appeal and, thus, was barred from further review in habeas corpus. (ECF No. 32, Attach. 2 at 23-24). The circuit court further found that Petitioner had waived the claim that his due process rights were violated by the SCAWV reviewing his appeal based upon an incomplete transcript. Specifically, the court stated, "the absence of the entire record was the product of Petitioner's agreement and waiver that the entire record would not be submitted to the [SCAWV]" and that "Petitioner has not submitted any evidence proving that his waiver was not knowing and intelligent." (*Id.* at 24-25). Subsequently, the SCAWV summarily refused Petitioner's appeal on these issues and affirmed the circuit court's rulings. (ECF No. 32, Attach. 2 at 4).

Petitioner filed another habeas corpus petition, which was considered by the SCAWV, under its original jurisdiction, and was consolidated with a petition for a writ of mandamus that Petitioner had also filed. In the second habeas petition, Petitioner asserted: (1) Petitioner's right to an impartial jury was violated and the SCAWV failed to consider the entire record because they lacked the transcripts of the last four days of trial; (2) the SCAWV failed to consider the entire record in the case because it lacked the final four days of trial transcripts; (3) there was no crime and no biological proof of any crime; and (4) Petitioner's counsel was incompetent in filing any kind of appeal without all of the trial transcripts. (ECF No. 32, Attach. 2 at 32-45). However, the SCAWV denied that petition without making any findings on the merits of those claims. *State ex. rel. Daugherty v. Hoke*, No. 12-0124 (W. Va. July 27, 2012).[4]

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[4] The SCAWV order denying the original jurisdiction habeas petition does not appear to be a part of the record before this court.

14

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.    The Court further held that, under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.    The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

## ANALYSIS

### A.    Denial of due process on appeal due to incomplete transcript.

In Ground One of his Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, Petitioner contends that he was denied his right to due process by not being provided with a complete trial transcript prior to pursuing his appeal.    Petitioner's amended petition asserts:

> The Supreme Court of the United States has held that a "court-appointed counsel who represents the indigent on appeal gets at public expense, as a minimum, the transcript which is relevant to the points of error assigned."

> *Hardy v. United States*, 375 U.S. 277, 279 (1964). In a case like Daugherty's, where the defendant challenges the sufficiency of the evidence [to] support his convictions, the entire transcript is relevant to a point of assigned error. *See United States v. Huggins*, 191 F.3d 532, 536 (4th Cir. 1999) (a "criminal defendant has a right to a meaningful appeal based on a complete transcript").

(ECF No. 187 at 14). In support of this claim, Petitioner relies upon the United States Supreme Court's decision in *Entsminger v. Iowa*, 386 U.S. 748 (1967), and the SCAWV's decision in *Mayle v. Ferguson*, 327 S.E.2d 409 (W.Va. 1985).

The United States Supreme Court has not recognized a freestanding constitutional right to a criminal appeal or a complete appellate transcript. *See, e.g., Hardy v. United States*, 375 U.S. 277, 282 (1964); *Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("[T]he Constitution does not require States to provide a system of appellate review at all."); *Abney v. United States*, 431 U.S. 651, 656 (1977) ("[I]t is well settled that there is no constitutional right to an appeal."); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) ("[A] state is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all.") Nevertheless, "if a State has created appellate courts as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (alteration in original) (internal citation omitted) (quoting *Griffin*, 351 U.S. at 18). Thus, an indigent criminal defendant must be provided "a 'record of sufficient completeness' to permit proper consideration of [his] claims" brought on appeal. *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (alteration in original) (quoting *Draper v. Washington*, 372 U.S. 487, 499 (1963)).

However, "[a] 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript." *Id.* at 194. "[O]nce a State offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits of the appeal." *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) (emphasis added) (citing *Griffin*, 351 U.S. 12). A claim grounded in an incomplete transcript is construed as a procedural due process claim, and thus, the petitioner must establish the requisite prejudice to his appeal. *See United States v. Huggins,* 191 F.3d 532, 536 (4th Cir. 1999) ("[W]hether an omission from a transcript warrants a new trial depends on whether the appellant has demonstrated that the omission specifically prejudices his appeal[.]"); *Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) ("[C]laims based on incomplete transcripts must show that 'the absence of such a transcript prejudiced [the defendant's] appeal.'") (quoting *Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987))); *United States v. Vazquez Guadalupe*, 407 F.3d 492, 498 (1st Cir. 2005) ("[T]o obtain reversal and a new trial, the defendant must demonstrate specific prejudice to his ability to perfect an appeal."); *White v. Dep't of Corr.*, 939 F.2d 912, 914 (11th Cir. 1991) ("[T]he absence of a perfect transcript does not violate due process absent a showing of specific prejudice.") (citing *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986) and *Mitchell v. Wyrick*, 698 F.2d 940, 941-42 (8th Cir. 1983)); *Stroud v. Hooks*, No. 3:18-cv-00120-FDW, 2019 WL 937336, *4, *7 (W.D.N.C. Feb. 16, 2019) (due process claim grounded in incomplete transcript denied because petitioner did not establish requisite prejudice). Such prejudice must be "more than rank speculation." *Bransford*, 806 F.2d at 87. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Although Petitioner raised this due process claim in his state habeas corpus proceedings, the state courts found that he waived it when he agreed to proceed with his appeal with only a portion of the trial transcript.  (ECF No. 32, Attach. 2 at 24-25). Respondent contends that, "[b]ecause the Petitioner waived the right to a full transcript and agreed to proceed on a limited record on appeal based upon the advice of counsel, he cannot make a freestanding claim that his lack of a transcript violated his due process rights."  (ECF No. 194 at 14).  Respondent further contends that "[a]ny claim the Petitioner has as to the absence of a full transcript before the [SCAWV] sounds in ineffective assistance of counsel[,]" which is a claim that has not been properly exhausted.[5]

Nonetheless, Respondent further asserts that Petitioner's case is distinguishable from the facts of *Entsminger*, the United States Supreme Court decision upon which he relies.  In *Entsminger*, the Court reviewed a specific procedure under Iowa law permitting an appeal to proceed on a "clerk's transcript," which did not constitute the complete record, and was used in the absence of a request for plenary review.  The Court found:

> Here there is no question but that petitioner was precluded from obtaining a complete and effective appellate review of his conviction by the operation of the clerk's transcript procedure as embodied in Iowa law. Such procedure automatically deprived him of a full record, briefs, and arguments on the bare election of his appointed counsel, without providing any notice to him or to the reviewing court that he had chosen not to file the complete record in the case.

386 U.S. at 752.

Respondent contends that, unlike *Entsminger*, Petitioner consented to and actually waived his right to pursue his appeal with a full transcript based on the advice of

---

[5] The ineffective assistance of counsel claim will be separately addressed below.

counsel. (ECF No. 192 at 14-15). Respondent points to a letter that attorney Bruce wrote to the Office of Disciplinary Counsel summarizing the decision to proceed on the partial transcript, which stated in pertinent part:

> During the trial there were two court reporters—one for the Defendant's part of the trial and one for the Plaintiff's part of the case and closing argument. The Defendant requested the entire transcript of the trial. The Plaintiff's part of the case was transcribed by Court Reporter, Anne Owens and was readily available. A transcript of the Defendant's side of the case was never provided. The Assistant U.S. Attorney [sic] handling the case and Defendant's counsel discussed whether we should go forward with the appeal hearing without the transcript of the Defendant's part of the case. The Supreme Court accepted the case on the nullification issue. The State's attorney and Defendant's counsel agreed that Defendant's transcript was not necessary and neither would argue anything from Defendant's case since the issue[,] the appeal issue[,] was very narrow. The complete transcript of the hearing on the motion for a new trial based upon jury disqualification was in the record and completely covered the issue that the court accepted the appeal.

(ECF No. 194 at 16-17; ECF. No. 80 at 22). Respondent further emphasizes that Bruce's letter specifically stated that, "Mr. Daugherty was aware of that issue and agreed to submit the case upon recommendation of counsel on the record submitted for the appeal that was allowed." (ECF No. 194 at 17; ECF No. 80 at 22).

Petitioner's Reply asserts that he could not knowingly and voluntarily waive his right to a complete transcript based upon the mis-advice of his counsel. (ECF No. 195 at 1-4). After acknowledging that appellate counsel may validly determine which issues to pursue on appeal, Petitioner points to case law concerning the waiver of other rights, such as the right to a jury trial, the right to an appeal, or the right to counsel, and attempts to equate the transcript waiver issue to those rights, suggesting that Petitioner could not validly agree, through his counsel, to proceed on appeal on a partial transcript, without being fully advised of the risks involved. His Reply further states:

> Constitutional rights, however, are personal and belong to the defendant and cannot be waived by proxy. Thus, it was simply not sufficient for Bruce to consult with Daugherty before deciding to proceed on appeal without a complete transcript. For such a waiver to be valid some court would have to have examined Daugherty and ensured that his waiver was knowing and voluntary. Without such procedural safeguards no waiver can be found.

(*Id.* at 3). However, Petitioner does not cite to any authority indicating that the right to a complete transcript on appeal is akin to the seminal procedural rights mentioned in his brief, and the undersigned therefore finds the cases cited therein to be inapposite.

The Circuit Court order denying Petitioner's habeas corpus petition, which was summarily affirmed by the SCAWV, found as follows:

> The Court believes the absence of the entire record was a product of the Petitioner's agreement and waiver that the entire record would not be submitted to the West Virginia Supreme Court of Appeals. The Petition for Writ of Habeas Corpus clearly indicates that the Petitioner agreed to proceed with the appeal despite not submitting the entire record. Furthermore, the Petitioner has not submitted any evidence proving his waiver was less than knowing or intelligent. Therefore, since Petitioner's second ground for habeas corpus relief has been waived, the Petitioner is not entitled to Post-Conviction Habeas Corpus Relief on "Ground Two" of the Petition.

(ECF No. 32, Attach. 2 at 24-25).

The relevant clearly established Supreme Court precedent requires only that a criminal defendant be provided with a record of sufficient completeness to provide meaningful review of the issues to be addressed. The SCAWV limited Petitioner's appeal to the juror misconduct issue and the parties agreed that the available record was sufficient to address that claim. Petitioner has not established that the missing portions of the transcript were material to the outcome of his appeal.

The undersigned proposes that the presiding District Judge **FIND** that, Petitioner cannot establish a valid due process violation and, therefore, he has not demonstrated that the state courts' decisions denying him habeas corpus relief on this basis were

contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts presented in the state court proceedings. Accordingly, he is not entitled to habeas corpus relief under § 2254 on Ground One of his Amended Petition.

### B.    Ineffective assistance of appellate counsel.

In Ground Two of his Amended Petition, Petitioner contends that his counsel, Barry Bruce, who represented him at the trial court level, on appeal, and in his state court habeas corpus proceedings, rendered ineffective assistance of counsel at the appeal stage because he advised Petitioner to pursue his appeal based upon an incomplete appellate record and then waived oral argument before the SCAWV. However, as asserted by Respondent, Petitioner did not properly exhaust the available state court remedies concerning his ineffective assistance of counsel claims.

Petitioner did not assert these claims in his first habeas corpus proceeding in the Circuit Court of Summers County or the appeal therefrom. While Petitioner did assert these claims in his second habeas corpus petition filed under the SCAWV's original jurisdiction, that petition was summarily dismissed without prejudice, with no findings on the merits of the ineffective assistance of counsel claims. Thus, those claims were not exhausted through that petition. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Ground Two of his amended § 2254 petition is not properly exhausted.[6]

---

[6] Petitioner's Reply suggests that his ineffective assistance claims are procedurally defaulted because they were not raised in his initial state court habeas proceeding. (ECF No. 195 at 10). Petitioner further suggests that the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1, 16-17 (2012), supports a finding that Bruce's failure to withdraw from representation to allow claims concerning his ineffective assistance to be raised in the first habeas corpus proceeding should excuse the procedural default and permit this court's review of the merits of those claims. (*Id.*) However, Petitioner's ineffective assistance of counsel claims pertain to Bruce's conduct during appellate proceedings, not at trial. The Supreme Court has explicitly

However, as noted by Respondent, despite the fact that he has been released from incarceration and, thus, is no longer in custody for the purpose of a state habeas corpus petition, Petitioner may still have an avenue of state proceedings through which he could address his ineffective assistance claims, which is via a writ of error *coram nobis*. Syl. Pt. 3, *State v. Hutton*, 776 S.E.2d 621 (W. Va. 2015) (recognizing the common law writ of error *coram nobis*). Therefore, those claims are not necessarily barred from review in the state courts. *See* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); *see also Sanderlin v. Smyth*, 138 F.2d 729, 731 (4th Cir. 1943) ("The federal court should not issue the writ, even in the extraordinary cases above indicated, unless it is made to appear that petitioner has no adequate remedy in the state courts. If he has such remedy by . . . writ of error *coram nobis* or otherwise, he must pursue it, and can have the writ from the federal courts only after all state remedies have been exhausted.")

Nevertheless, pursuant to 28 U.S.C. § 2254(b)(2), a federal court may deny a claim on its merits, notwithstanding non-exhaustion. Here, Petitioner cannot demonstrate the requisite prejudice concerning his juror misconduct claim (which is the only claim that the SCAWV accepted for review on appeal). Thus, even if he could establish that his counsel's conduct fell below an objective standard of reasonableness by advising Petitioner to proceed with his appeal on an incomplete record and without oral argument,

---

found that the rationale in *Martinez* does not support extending its exception to appellate-ineffectiveness claims. *Davila v. Davis*, 137 S. Ct. 2058, 2065-70 (2017). Thus, the undersigned is not persuaded by Petitioner's argument. Moreover, as discussed below, the undersigned recommends herein that Petitioner's ineffective assistance of counsel claims should be denied on the merits, despite being unexhausted.

he cannot demonstrate the requisite prejudice to meet the second prong of the *Strickland* standard in order to establish a Sixth Amendment violation grounded in ineffective assistance of counsel. Therefore, the undersigned proposes that the presiding District Judge **FIND** that, notwithstanding his failure to exhaust his ineffective assistance of counsel claims, such claims lack merit and may be denied under § 2254(b)(2). Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner is not entitled to any relief under § 2254 on Ground Two of his Amended Petition.

### C. Juror misconduct issue.

In the third and final ground of his Amended Petition, Petitioner contends that he was denied a fair trial, in violation of his Sixth and Fourteenth Amendment rights, because juror McBride allegedly stated, during jury deliberations, that he knew Petitioner or his family, and that he feared for his children if Petitioner were not convicted. As noted above, in denying Petitioner a new trial, the state courts found that McBride's statements were subject to West Virginia Rule of Evidence 606(b), which prohibits inquiry into the jury deliberation process.

Petitioner contends that McBride's statements constituted "extraneous prejudicial information" or an "outside influence" that was improperly brought to the jury's attention and prejudiced his verdict. Thus, Petitioner further contends that McBride's statements are an exception to the Rule 606(b) prohibition that should result in presumed prejudice. *See Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Barnes v. Joyner*, 751 F.3d 229, 235 (4th Cir. 2014). Consequently, Petitioner asserts that the state courts improperly denied him a new trial on this basis.

23

Respondent, on the other hand, asserts that the SCAWV "recognized that Petitioner's fear for his children's safety was not extraneous to the jury's verdict in the case, but related directly to the deliberative process." Therefore, Respondent contends that it is not competent evidence upon which to impeach the jury verdict and that Petitioner's claim for habeas corpus relief on this basis should be denied.

As noted by Respondent, the standard for habeas corpus review by this federal court is extremely limited. Thus, even if this court would have decided the issue differently, it may not grant habeas relief unless it finds that the state courts' decisions were contrary to or an unreasonable application of clearly established precedent of the United States Supreme Court. Accordingly, the undersigned begins by addressing the applicable legal authority.

The Sixth Amendment provides, in relevant part, that "the accused shall enjoy the right to a . . . trial[ ] by an impartial jury . . . [and to] be confronted with the witnesses against him." U.S. CONST. amend VI. The right to trial by an impartial jury "guarantees . . . a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This right prohibits "any private communication, contact, or tampering directly or indirectly, with a juror during trial about the matter pending before the jury." *Remmer v. United States,* 347 U.S. 227, 229 (1954).

The right of confrontation requires that the "jury's verdict must be based upon the evidence developed at the trial." *Turner v. Louisiana,* 379 U.S. 466, 472 (1965). In addition, it "necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]." *Id.* at 472 (internal quotation marks omitted).

However, the Sixth Amendment does not require that all evidence tending to impeach the jury's verdict be considered by the courts. *See Tanner v. United States,* 483 U.S. 107, 117 (1987). In fact, the common law rule generally "prohibited the admission of juror testimony to impeach a jury verdict." *Id.* As relevant here, this common-law "no impeachment" rule was codified under West Virginia state law in Rule 606(b) of the West Virginia Rules of Evidence. A comparable rule is found in the Federal Rules of Evidence and "[s]ome version of the no-impeachment rule is followed in every State and the District of Columbia." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 865 (2017). The West Virginia rule states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

W. Va. R. Evid. 606(b).

As the United States Court of Appeals for the Fourth Circuit has noted, the exceptions set forth in these rules track the protections guaranteed by the Confrontation and Impartial Jury Clauses of the Sixth Amendment. *Robinson v. Polk*, 438 F.3d 350, 360 (4th Cir. 2006). Thus, the relevant issue before this court is whether McBride's statements were "extraneous prejudicial information" or an "outside influence" that would meet the exception to Rule 606(b) and permit the court to invade the province of jury deliberations.

In *Robinson*, the Fourth Circuit examined various Supreme Court decisions addressing whether juror conduct constituted such an extrinsic influence or was, instead, conduct that was part of the internal deliberative process.  One distinct set of cases concerns situations where jurors engaged in communications with third parties or brought information from third parties into the jury room.

For example, in *Remmer, supra,* 347 U.S. 227 (1954), the Supreme Court found that a third party's attempt to bribe a juror was an outside influence that was an exception to the Rule 606(b) and would allow inquiry into the juror's exposure to improper influence.  Likewise, in *Parker v. Gladden,* 385 U.S. 363 (1966), and *Turner v. Louisiana,* 379 U.S. 466 (1965), the Court determined that a bailiff who communicated with jurors about the defendant, and other conduct by sheriff's deputies who were assigned to marshal the jury during trial proceedings, were outside influences that permitted inquiry into the jury deliberation process.

However, these cases are distinguishable from cases like *Tanner v. United States,* 483 U.S. 107 (1987), in which the court found that a claim of juror impairment during deliberations was an *internal* influence that would not allow inquiry into the core processes of the jury's deliberations.  *Tanner* cited approvingly to the Court's prior decisions in *McDonald v. Pless*, 238 U.S. 264 (1915), and *Hyde v. United States*, 225 U.S. 347 (1912), where the Court did not allow the jury's deliberative process to be pierced, despite noting obvious prejudice or evidence of a compromised verdict. *But see Pena-Rodriguez*, *supra*, 137 S. Ct. 855 (2017) (holding that a clear statement of racial bias during jury deliberations overcomes the no-impeachment rule).

Likewise, in *Robinson*, the Fourth Circuit found that the denial of a claim alleging an improper jury influence based on the physical presence and reading of a Bible during

jury deliberations on the imposition of the death penalty was not an unreasonable application of clearly established federal law.  As the *Robinson* Court noted:

> Although the Supreme Court has never provided a formula for deciding whether a particular influence upon the jury was external or internal, it did cite approvingly to lower courts holding that the distinction turns not on whether the influence occurs inside or outside the jury room but is rather "based on the nature of the [influence]." *Id.* at 117. * * * *Tanner* thus establishes that the Sixth Amendment's guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process.  Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.,* information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, 15 *see Parker,* 385 U.S. at 364, 87 S. Ct. 468; *Turner,* 379 U.S. at 473, 85 S. Ct. 546, or (2) is an outside influence upon the partiality of the jury, such as "private communication, contact, or tampering … with a juror," *Remmer,* 347 U.S. at 229, 74 S. Ct. 450.

438 F.3d at 361-62.  The Court further noted, "[t]o be sure, the line between an 'external' influence and an 'internal' influence is a fine one, and one that may even blur upon inspection."  *Id.* at 364.

The undersigned has not located any Supreme Court precedent based upon materially indistinguishable facts to those in the instant matter and the state courts appear to have identified the correct principles of clearly established law.  Thus, this court's review is limited to determining whether the state courts' decisions were an unreasonable application of the applicable clearly established law to the facts of this case or based upon an unreasonable determination of the facts presented in the state courts. *See* 28 U.S.C. § 2254(d)(1) and (2).

Based upon an exhaustive review of the record, this matter is more analogous to *Tanner* and *Robinson*, than to *Parker*, *Turner*, or *Remmer*, in that it does not involve any external communication with a third party.  Rather, the instant case involves an alleged statement by a juror, made during jury deliberations, concerning his feelings and beliefs,

which was intrinsic to the deliberative process. This case is also distinguishable from the Supreme Court's recent decision in *Pena-Rodriguez*. There, the court emphasized that "[r]acial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald,* the drug and alcohol abuse in *Tanner,* or the pro-defendant bias in *Warger*." 137 S. Ct. at 868.

Petitioner further asserts that the state courts improperly considered McBride's alleged statements that he knew Petitioner or his family and that he feared for the safety of his children if Petitioner were not convicted, disjunctively, rather than conjunctively. However, even to the extent that McBride allegedly stated that he knew Petitioner or his family, that statement, taken alone or together with McBride's statement of fear, cannot be construed as an "external influence" or a disqualifying fact under the circumstances. The Supreme Court has unanimously recognized that juror comments during deliberations cannot be used to show dishonesty during jury selection. *See Warger v. Shauers,* 135 S. Ct. 521 (2014) ("We hold that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during voir dire. In doing so, we simply accord Rule 606(b)'s terms their plain meaning."). Thus, under this Supreme Court authority, McBride's alleged statements about Petitioner during jury deliberations was an internal influence about which Rule 606(b) prohibits inquiry in order to challenge the integrity of the verdict.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' decisions concerning this claim were contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, the undersigned further proposes that the

presiding District Judge **FIND** that Petitioner is not entitled to habeas corpus relief on Ground Three of his Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.

## **RECOMMENDATION**

For all of the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 187) and **DISMISS** this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendations is hereby **FILED**, and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Judge Volk.

29

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy to counsel of record.


June 26, 2020

_____
Dwane L. Tinsley
United States Magistrate Judge